Filed 4/26/23  P. v. Martinez CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>PEDRO FRANCISCO GALVAN MARTINEZ,<br><br>        Defendant and Appellant. | A161995<br><br>(San Mateo County<br> Super. Ct. No. 19NF009837A) |

Pedro Francisco Galvan Martinez (Galvan)[1] was convicted of rape, forcible oral copulation, false imprisonment by violence and making criminal threats after an incident he claimed was a consensual sexual encounter with a coworker, Karla Doe.  He contends his attorney rendered ineffective assistance of counsel by failing to impeach Doe with expert testimony or evidence on the correct translation of certain Spanish words used in texts; the jury instructions unfairly emphasized Doe's testimony, lightened the prosecution's burden of proof, and violated Galvan's constitutional right to equal protection; and resentencing is required due to post-sentencing

_____

[1] Pursuant to his expressed preference, appellant was referred to at trial as "Galvan."  We will do the same in this opinion.

1

statutory amendments affecting the imposition of upper terms. We will affirm the convictions. We agree with Galvan, however, that remand for resentencing is required.

## BACKGROUND

Galvan and Doe were coworkers on a construction job at the San Francisco Airport Grand Hyatt Hotel, working a 2 p.m. to 10 p.m. shift. They met when Doe began to work for their employer, Webcor, on May 30, 2019.[2] There were only a few women in the workplace: Alejandra Perez worked on the morning shift and a second woman joined the evening shift subsequent to Doe. Galvan's brother-in-law, Rene Ortega, was the foreman on the evening shift.

Doe had moved back to San Francisco (her birthplace) from Mexico in February 2019 and lived with her two daughters and her mother; many of her maternal relatives lived in California. She had been widowed in 2013 and in May 2019 had been in a relationship with her boyfriend for over a year. Galvan had also moved to the United States from Mexico in 2012. He married his current wife in 2012 and had three children with her.[3]

---

[2] Unless otherwise specified, dates referred to in this opinion are in the year 2019.

[3] Galvan, Doe and several other witnesses were assisted at trial by Spanish-speaking interpreters.

2

# I.

## *The Prosecution's Case at Trial*

### A. Doe and Galvan Meet at Work.

#### 1. *Doe's testimony*

Doe was excited about getting the job at the airport hotel because she needed medical insurance for her family, especially one of her daughters, who had an on-going problem with her arm. Doe needed to work 430 hours before she would receive health benefits. At the time of the incident underlying this case, she was short 33 hours.

Doe testified that she worked with Galvan from the second day on, sometimes with other people and sometimes just the two of them. Galvan decided how work groups were formed; although he was not the foreman, everyone followed what he said.

When Doe started the job, Galvan was courteous, respectful and friendly, but after a time he began to make comments she did not like. One example was Galvan saying, referring to Doe, that he "couldn't believe that . . . being that he was so good looking that he could be in a hotel with somebody that he liked and that nothing else was happening." Doe testified, "it was like he was trying to pick up on me, but then when he could see it, it wasn't like that. Then he would say[,] 'Oh, I am just joking.'" One time, Galvan told Doe to look at something on his phone that turned out to be a photo of him coming out of the shower. She told him, "don't step over the line," and not to bother her. Another time, after others got off a crowded elevator, Galvan remained close to Doe and "went like he was going to give me a kiss." She got very angry and told him to "avoid having problems for yourself and for me, too." She told Alejandra Perez about this incident but did not report it to the company because she thought she could reject Galvan

without there being problems. Also, there was "a lot of harmony between co-workers" at the job and she "didn't want them to think that because a woman arrived on the job that . . . this would be gossip and problems."

### 2. *Coworkers' testimony*

Alejandra Perez testified that Galvan did not like it when Doe spoke or worked with other "workmates." On an occasion when Perez asked Galvan why Doe was not at work, Galvan "was bothered" and said Doe had gone to Los Angeles to be with her boyfriend. When Perez told Doe that Galvan had seemed upset about this, Doe said "he was crazy." Doe told Perez about an incident in which Galvan tried to kiss her in an elevator and she pushed him, and an incident when he tried to kiss her while they were on "other floors." Doe never told Perez she wanted to have a relationship with Galvan or was attracted to him.

Prior to July 26, Doe had texted Perez saying Galvan was harassing her. Perez told Doe not to pay attention and "men are like that," and suggested that they talk to someone "higher up" so Doe could change from the evening shift to the morning shift, when Perez worked. Perez testified that Doe considered reporting the harassment to her "boss" but did not think he would believe her because he was Galvan's brother-in-law.

Two coworkers on the evening shift, Juan Zuniga and Cornelio Valencia, testified that Galvan and Doe always worked together. Zuniga testified that Galvan did not "specifically" have authority to assign Doe to work with him, but he would tell her they were going to be working together; Valencia had seen Galvan assign Doe to work with him and testified that Galvan would sometimes assign workers their tasks when the foreman was not there. Neither Zuniga nor Valencia had the impression that Galvan and Doe were in a relationship.

4

**B. Galvan and Doe's text messages**

Doe communicated with Galvan through text messages both for work purposes and outside of work.  Records of these text messages showed, for example, a work-related message from Galvan to Doe on June 25, and on June 30 there were both texts and phone calls in which Galvan asked Doe to come and jump his car because the battery had died.

A lengthy series of messages between Galvan and Doe, documented in Exhibit 3 at trial, is the basis of one of Galvan's claims on appeal.  On Friday July 19, Doe received a text from Galvan at 10:03 p.m., as she was about to drive home, saying "Mama Lucha, can you set aside a slice of cake for me and then have a nice weekend."  She responded, "[O]f course I will.  Same to you."  Doe testified that her mother and daughter had birthdays that weekend and explained that "Mama Lucha" is a term used in Mexico "in a loving way to refer to a woman that is raising her children on her own. [¶] . . . [¶] It is like playing around.  It is not affection.  It is not affectionate or offensive.  It is neutral."

The texts continued with Galvan saying, " 'We stayed back here to down some brewskies or beers' " and Doe replying that she had already gotten home.  Galvan texted, " 'Just one more, and I'm leaving,  Get some rest.  I love you.' "  Another message from him said, " 'I know you do, too, but you don't say it,' " followed by " 'Silence speaks volumes.' "  Another, after 30 minutes, said, " 'Hello,' " then, " 'Are you there?' "  Twenty minutes later, Galvan texted, " 'Aren't you going to say anything?' " and then, " 'Do you love me?  Asking.' "  Doe replied, "No."  He responded with three emojis with sad faces and asked, " 'What do you feel?' "  She replied, " 'You don't either[,]' " which she testified meant, " 'I don't love you, and you don't love me either.' "

5

He said, " 'I do,' " and she told him not to lie, then asked if he was still at work.

Doe testified that she never had a romantic relationship with Galvan and "didn't give much importance" to the text messages saying he loved her and "I know you do too" because "he felt that he was kind of a ladies man, and I felt like it didn't effect [*sic*] me, and because . . . at that time I thought that whatever anybody would offer you, you could just reject it. [¶] You could just tell them no, and that you would not be in any type of risk."

There followed a conversation in which Doe said she was happy Galvan was going to "sing and brighten other peoples' day," because he had said he was going to sing with his band, then expressed surprise when he said he was going to work instead. He asked if she wanted to work, which she did because she was trying to accumulate the hours necessary to obtain her health benefits. He said he would help her, and when she said she did not want to cause any problems, he said he had already talked to the supervisor. He then texted that she had not replied when he asked what she felt and she replied, " 'Gratitude and admiration. You are a very good person.' " Doe testified that she felt gratitude that he was helping her get work the next day and that he was patient in helping her learn at work, and admiration because he was "a very good worker."

Galvan asked, " 'What else,' " and then, " 'What is there in that little chest of yours?' " She replied, " '[n]othing more' " and asked him, " 'And you?' " He said, " 'Everything,' and then a sad emoji," and when she asked what that meant he said, " 'You move me completely, woman.' " She told him not to lie. Galvan said, " 'I see you, and I love being with you,' " and " 'Haven't you noticed,' " and she told him, " '[You're] a real ladies' man,' " and, " 'You're very flirtatious.' " Galvan said, " '[j]ust with you' " and told her, " 'I

6

want to feel more, but you don't let it happen,' " and she replied, " 'You already know I'm old-fashioned.' " Asked at trial what she meant by this, Doe testified that she had previously told Galvan she was a widow, had never considered cheating on her husband and was now in a new relationship, and her text meant she was "not willing to do things that hurt other people."

Galvan texted, " 'Then I shouldn't expect anything with you,' " and she responded, " 'Are you not interested in my friendship?' " He said, " '[o]f course' " and she replied, " 'I'm happy' " and tried to change the subject by asking about lunch for work the next day. Ignoring her attempt, Galvan told her, " 'And it is the best thing that has happened to me, and you're an excellent woman, and I have already told you that.' " She felt he was "fighting to see if he could get together with me" and, trying to ignore his comment, pursued her questions about lunch. Galvan texted, " 'But in my chest, there is something that wants to come out every time I'm near you.' " Doe responded that she felt the same as him but testified at trial that this was a mistake; she meant to be responding to Galvan's prior message by saying she felt the same regarding "the admiration that I had told him that I had for him in the past." Doe thought she was "putting up a barrier, that nobody was going to be able to force me to do anything, so you could say that his comment was personal, but . . . mine was work-related." She had previously told Galvan and other coworkers that she was grateful for having co-workers who were "so good and so patient." Doe conceded on cross examination that the messages themselves did not make clear that she was only talking about work.

In further texts, Galvan told Doe he felt fortunate; she told him he was fortunate for his family and he said was referring to her. He asked what she was afraid of, and she said she would have a "bad conscience" if she were to

7

do "something bad" and did not think she "could ever misbehave."  Galvan told her, " 'you make me weak in the knees' " and, " 'I like to have you near me,' " then sent an emoji sending a kiss and wrote, " 'I know that is not okay, but what can I do?' "  Doe told him she thought it would pass; she explained at trial that she wanted to let him know "he was never going to have anything with me."  She then told Galvan she was "not like most women," which she testified was a reference to his having told her "women would offer themselves to him."  Galvan said this was why he liked her.

At 12:33 a.m., Galvan texted, " 'What I know is that you feel the same as me, but you don't dare tell me.' "  Doe responded, " 'I know that you are a great person in many aspects, and you think that no one can resist you.' "  Doe testified that she said this because Galvan "constantly" commented that "women would offer themselves to him."  He had previously told her he had a relationship outside his marriage with a woman in Modesto.

Galvan told Doe he thought they had something in common that made them attractive to each other and she asked what he thought this was; she testified that she asked this "jokingly."  He replied that she was " 'very special and shy, but the heart doesn't understand.' "  She told him he should value and respect his wife more, and her boyfriend also did not "deserve me to fail him."  When Doe repeated that Galvan would " 'get over it,' " he asked, " 'Was that a resounding no,' " and she told him " 'Yes, it was a resounding no.' "  She also told him, " 'Aside from respecting my partner, I also need to respect myself.' "  An hour and a half later, he texted " 'Are you asleep already?' "  She did not respond.

The next morning, Saturday July 20, Galvan texted that he did not want to go to work, which Doe testified meant she could not go either because "according to him, he had done me the favor of saying that I could go in to

8

work." Galvan asked if she was upset about not working and she told him it was not a problem, and he should enjoy his family. She then texted, " 'I need to tell you something very important. It is not necessary that it be to your birthday or some other date. You deserve the best in the world for being a good son, a good father a good husband, a good family member, and a good friend.' " Doe testified that people send "gratitude chains" on WhatsApp, to " '[t]hank the people . . . that are still living,' " and she also sent messages like this to her daughters, her mother, two female friends and a nephew.

Galvan thanked Doe for the message and reiterated that she was a great woman; she replied, " 'May God continue to bless you' " and he said, " 'It is too bad that I met you too late.' " Doe wrote, " 'Thank you, super-intelligent and hard working person. You don't expect blessings to fall from the sky. You work for them always.' " She also asked, "why is it a shame if you have a very valuable wife and your treasures," meaning his children. There followed a lengthy conversation in which Galvan told Doe about serious problems in his marriage and she made supportive comments. At one point she told him, "it is not easy to have a good looking husband." Doe testified that he had told her his wife was "very insecure and jealous" and her text was saying that "when a woman is jealous, it becomes more complicated."

At the end of this conversation, they wished each other a good weekend and Doe texted, "T-Q-[M]." Asked what this means, Doe testified, "I love you a lot, but in Spanish it is not love you. It is like I appreciate—I hold you in

esteem." The prosecutor asked, "So did you mean that in a romantic sense?" and she said "No."[4]

Galvan responded to the text with " 'I send you a big hug' "; she said, " 'Same to you' "; he said, " 'See you on Monday, Mama Lucha' "; and she replied, " 'See you Monday, Superman.' " Doe testified that she called Galvan Superman "in relation to" him calling her Mama Lucha, which she likened to "[s]uper mom." She denied defense counsel's suggestion that calling Galvan "Superman" implied they had a physical relationship and testified that she knew he was helping his mother, sister and brother financially and was referring to that in response to him "cheering me on for being Mama Lucha."

On Monday July 22, Doe texted Galvan that she had forgotten to tell him she had his knife, which he had left when they were "covering the carpet" the prior Friday, and she would bring it to him. She returned the knife to him that day. Doe testified that this was a red knife with his name etched on it, not the one used in the attack.

On July 23, Galvan sent Doe a picture that she said was of a job they had done in which she did not cover the left side of a cabinet because she did not have enough of the necessary tape. She testified that Galvan had previously advised her to pay attention to details and finish a job perfectly.

On July 25, Galvan told her he was going to be spending the night at a hotel and asked "in the form of a joke" if she was interested in joining him. She said she was not.

---

[4] Doe testified that in a text she sent to Perez that included, " 'I love you a lot,' " she did not mean she loved Perez in a romantic sense. Similarly, Perez was asked about a text in which she told Doe, " 'I love you, friend,' " and testified that she did not mean this in a romantic way but as love "like sisters."

### C. The assault

#### 1. *Doe's testimony*

On the morning of July 26, Galvan texted Doe asking where she was going to " 'invite [him] to have breakfast.' " She responded, " 'Let's go to mass,' " and he agreed, then said he had a doctor's appointment. At work that day, Doe thought she had lost her phone and tried unsuccessfully to find it; it turned out Galvan had hidden it as a joke, and Doe got very angry. She called Perez to tell her about the incident and talk about changing to the morning shift. At some point, as Doe and Galvan were leaving a room they had been working in, Galvan suddenly gave her a kiss, touching just a little part of her lip, then "before [she] could get upset" told her he loved her like a sister. Doe thought "from there on" he was not going to be making "loving-type comments" toward her.

That evening, after realizing they had run out of caulk needed to finish a job they had started, Galvan told Doe that they were going to be locking doors to the hotel rooms, beginning on the 12th floor and working their way down.[5] They took the elevator to the 12th floor and began locking doors, each moving from the center to opposite sides of the hotel. Doe finished her side, went down the emergency stairs and continued on the 11th floor and then the 10th floor. As she went to close a door, Galvan grabbed her hand "as if he was playing to scare me." He told her they would go in the same direction, each locking doors on opposite sides of the hallway, and added that they should go into the rooms to see if the morning shift workers had left caulking

---

[5] At 7:49 p.m. Doe texted Galvan that she had her knife. She testified that Galvan had said he lost his knife and asked if she had hers as he was walking away to ask other coworkers if they had seen it, and that this was before they went to the 12th floor.

11

in the rooms.  There were no lights in the rooms, but they had flashlights on their helmets.

On the ninth floor, Galvan stopped in a doorway and asked " 'Would you like a cup of coffee—' or '—a cup of sugar?' "  Doe testified that this is "kind of like a saying in Mexico."  Galvan gestured for Doe to come in and she went into the bathroom.  When she turned around, he was in front of her.  He said, " 'Do you think you can get me out of the way in order to . . . leave?' "  She told him to stop "playing around" and said they should look for the caulking.  He tried to kiss her and told her not to scream because no one would hear her; she knew her co-workers were all on different floors.  Galvan threatened her with his knife, bringing it close to her and telling her "what would it look like if the knife were to go across my . . . neck."[6]

Doe was scared.  Galvan took off her safety vest, which had her phone and her knife in pockets, and threw it on the floor.  Doe was leaning against the sink.  He lifted her blouse and started licking her breasts, then pulled down her pants and undergarments and licked her vulva.  He then turned her toward the wall and pushed her forward, causing her forehead to hit the mirror frame.  Galvan penetrated her vagina with his penis.  He also penetrated her anus, but she did not know if that was with his penis.  He ejaculated in her vagina.  He then told her he was going downstairs and she should not go down for 10 or 20 minutes.

Doe locked the safety lock on the room door and called Perez, who told her to call 911; Doe had not thought to do so "as if I didn't really believe what was happening"; she was confused, frightened, and angry.  She called 911

_____

[6] Doe acknowledged on cross examination that in several interviews she told the detective that she felt the knife touch her neck, then for the first time on October 8 she told him the knife did not touch her.

12

and while on the phone heard Galvan in the hallway, saying her name and trying to open the door to the room. When she heard him, Doe picked up her knife, which had fallen out of the pocket of her vest. She had previously picked up the yellow knife that Galvan threatened her with and wrapped it in her vest, then thrown the vest in the sink.

Galvan was with two other coworkers, who also told Doe to open the door, and the three came in after the foreman told them to "open the door any way they could." Doe told Galvan to leave and he did, then came back, telling the others that he and Doe were in a relationship as she yelled at him that he was lying and called him an asshole. Galvan told her, " 'Nobody is going to believe you.' "

Doe gave the knife Galvan threatened her with to the police who arrived at the scene.

### 2. *Coworkers' testimony*

Perez testified that she and Doe had been texting throughout the day on July 26 and, among other things, discussed the incident with Galvan hiding Doe's phone and going to Perez's foreman about changing Doe's shift. When Perez asked how it was going with Galvan, Doe said she had put him "in his place with her," there was "not going to be anything" and he "maintained a certain distance."

Sometime after Perez got home from work, Doe called, "hysterical" and crying, and said, " 'This asshole just raped me . . . put a knife up to my throat.' " Doe said Galvan told her to stay quiet because no one was going to believe her, then left, and she locked herself in. She did not know what floor she was on. Doe wanted Perez to call the police, but Perez told her to call so

the police could track her phone number and find her. Perez called Ortega and a "superintendent," and people went to look for Doe.[7]

Zuniga testified that on July 26, Galvan was in charge after the supervisor left at around 6 p.m. About 9 p.m., Ortega called and told Zuniga to have everyone stop work and look for Doe because something had happened to her. Five or ten minutes before, Galvan had called, saying he could not find Doe and asking if Zuniga had seen her.

Zuniga started looking for Doe with coworker Federico. Zuniga called Galvan to see if he knew where she was, and Galvan said she was in a room on the ninth floor. Zuniga and Federico found Galvan outside the room, trying to talk to Doe; he said Doe had had "a nervous breakdown or something like that." The door was locked with the safety latch and, after Ortega told Zuniga to "do whatever was necessary" to see whether Doe was okay, they pushed the door and broke the lock. Doe was in the bathroom. Zuniga and Valencia, who had also come into the room,[8] testified that Doe was "nervous" (or "really nervous"). She said Galvan had raped her and wanted him out of the room; Galvan denied the accusation and the two

---

[7] Perez did not know that Doe had been texting with Galvan for at least a week before July 26 or that she told Galvan she loved him; Doe had only said Galvan "would send her some messages." Perez was surprised that Doe would have said she loved Galvan, call him Superman or tell him he was the best thing to happen to her, but was not surprised Doe would tell Galvan he "deserve[d] the best of the world for being a good son, father, husband, relative and friend" because Doe "is of that style."

[8] Valencia testified that when he got to the ninth floor, he saw Galvan in the hallway, Galvan said Doe had had a "nervous fit," they walked to where Zuniga and Federico were trying to open the door to a room, and Galvan pushed the door open, breaking the lock.

started arguing. Valencia testified that before Doe started yelling at Galvan, Galvan told her to " '[t]ell them we had a relationship for a long time.' "

Zuniga stayed with Doe while Galvan and the others left the room. Valencia testified that Federico told him Doe had said Galvan used a knife on her, and that Galvan said Doe " 'wants to destroy my family, but she and I have a relationship.' " The police arrived and initially threw Zuniga on the ground when he opened the door to the room, trying to handcuff him until coworkers yelled that he had not done anything. Valencia testified that he told Galvan to tell the police he was the suspect, and Galvan surrendered himself.[9]

### 3. *Police Response*

A police dispatcher received Doe's 911 call at 9:06 p.m. on July 26, 2019. A recording of the call was played for the jury.

Officers responded at about 9:15 p.m. to the ninth floor of the Hyatt, where construction workers in the hallway pointed them to a door. After the officers announced themselves and began to detain Zuniga, Officer Wilson Ng went inside and found Doe on the bathroom floor, crying and appearing to be "in distress." She responded to him in Spanish and he called for an interpreter. Ng noticed a box cutter next to Doe and asked if that was the weapon used against her, but she "waved no with her hand." When Spanish-speaking Officer Fernando Leiva arrived, Doe told them that after directing her to check the bathroom for supplies, Galvan came from behind and tried to kiss her, she pushed away and he appeared very angry, pulled out a

---

[9] At some point Galvan gave Valencia a knife, saying, " 'Take the knife. I'm going to be arrested.' " Valencia put the knife in his tool bag at the end of the workday; he did not give it to the police because it was just a work tool and he did not realize it would become important.

15

boxcutter knife and "put it towards her chest," then pulled up her shirt, pulled down her pants and underwear, turned her around and sexually assaulted her. Doe said she bumped her forehead when Galvan pushed her against the wall during the assault. Ng took into evidence a silver and yellow box cutter that Doe had taken from her pocket and handed to Officer Leiva. The box cutter on the floor was left at the scene and later taken into evidence. Officer Leiva testified that Doe was crying during the interview and, in the ambulance to the hospital, was scared and "still pretty upset."

### D. After the assault

#### 1. *Doe's physical injuries*

Doe was taken to the hospital, where she reported neck pain and pain in the right lower quadrant. The examining physician documented a hematoma on Doe's head and spinal tenderness at the back of her neck, and the chart documented that Doe was teary-eyed.

Doe was then taken to the Keller Center, where sexual assault nurse examiner Kelly Charnas examined and took photographs of her. Shown these photographs, Doe testified that the bump on her forehead was from hitting the frame,[10] bruises on her arms were where Galvan held her, and a bruise on her stomach and bruises on her buttocks were where Galvan pressed her against the sink. She did not know whether a bruise on her upper back had been there before the assault.

Charnas testified that Doe told her the assailant held a utility knife "near" her neck and told her, " 'If you scream, it doesn't matter. No one will

---

[10] Perez testified that she did not see any injury on Doe's forehead at work on July 26. Doe's daughter testified that Doe did not have a lump on her forehead before she went to work on July 26; she noticed the lump and Doe's bruises when Doe returned home.

16

hear you.'" Doe said he grabbed her shoulders, held her and pushed her into a mirror frame, causing her to hit her head. In response to the nurse's questions, Doe said that his penis and finger went into her anus, he kissed her vagina area, mouth and breast, he licked her breast, and he ejaculated in her vaginal area. Doe was tearful at times during the exam and interview. She had bruises on her lower legs that she said were from work, a vaginal abrasion, a circular abrasion with some swelling and tenderness in the middle of her forehead that she said was not there before the assault, and bruising on her upper arms, shoulder, abdomen and buttocks, and an area of redness and swelling on the inside of her right upper gum. Charnas acknowledged that she did not know the cause of Doe's bruises independently; she documents bruises a patient was not aware of or knows were not there before the assault and does not document those the patient says preexisted the assault.

Geri Archibald, a nurse practitioner, forensic examiner and the clinical coordinator at the Keller Center, testified as the prosecution's expert in the conduct of forensic medical examination and analysis of injury, including mechanism of injury. She testified that Doe's vaginal abrasion could be consistent with consensual or nonconsensual intercourse, as well as with a finger in the vagina, and that the forehead injury could have been caused as Doe described or by almost any object in the room. She also testified that the color of bruises is not a reliable indicator of their age and that nurses at the Keller Center are trained to document injuries without trying to date them.

### 2. *Forensic evidence and interviews*

Galvan's DNA was found in sperm on swabs taken from Doe's vagina, cervix, anus, and perianus, and on cuttings from her underwear and pantyliner. Laboratory analysis of those samples also detected DNA from a

17

third person from which no conclusions could be drawn, including the sex of the contributor. No DNA was found on the blade of the yellow and silver box cutter; the handle was not tested.

San Mateo Sheriff's Office Sergeant Patrick Carey interviewed Doe at the Keller Center at around 4:30 or 5 a.m. on July 27. Doe was "emotionally distraught," cried "extensively" during the interview and was "very hesitant" to talk about the incident. In follow up interviews on August 6 and October 8 she was again emotionally distraught, crying and at times trembling.

Beginning on July 27, 2019, there were searches on Doe's phone for home security cameras, home security doors, registered sex offenders in San Francisco, rights of sexual assault victims and "safest cities where sexual assaults occur in California." Her phone's search history prior to the assault showed no such searches, nor searches related to sexual assaults, police investigations, worker's compensation claims, civil lawsuits or anything related to Galvan.

### 3. *Doe's Post-Assault Condition and Conduct*

Doe had been seeing a psychologist and a psychiatrist since the assault. She testified that she had not been able to "overcome the trauma": She felt "very afraid" when she went out and when her daughter went out. After the assault, she changed the lock on the door of her home, blocked the window on the door with wood and installed cameras for security. At the time of trial, Doe had not returned to work and was receiving workers' compensation. In addition to the attorney who helped her with workers' compensation, she had spoken with an attorney about the assault and about concerns that Galvan

18

and other workers had been using drugs on the job.[11]  She discussed suing Webcor with this attorney, but no lawsuit had been filed.[12]  She planned to sue Galvan.

When nurse practitioner Archibald saw Doe for a follow up visit on September 3, 2019, Doe described having persistent posterior neck pain and headaches she felt might be related to stress, and said she was still feeling anxious and emotional and was seeing a therapist.

Doe's daughter testified that after the assault Doe put up security cameras, changed the lock on the front door and covered the window in the door with wood.  Doe's behavior changed after the assault:  Her daughter described her as "destroyed" and testified that Doe "can't even get out of bed," has suicidal thoughts, and gets extremely nervous when the daughter goes out.

---

[11]  Doe testified that she was worried about workers using drugs on the job because Galvan had said he would take cocaine every Friday and said other workers were also using drugs.  Galvan had said he was not concerned about losing his job because the only drug testing was upon arrival at work, he was a hard worker and his brother-in-law was the foreman.  Doe testified that she had deleted from her phone a photograph Galvan sent her showing marble of the type used for the hotel sinks with a line of white powder he said was cocaine and a "rolled-up bill to one side."

[12]  Perez was asked on cross examination about a text she sent Doe on August 2, 2019, saying, "You can sue the company, friend, and you're not going to get a little bit of money out of them.  If not, at least a million out of hand."  Perez testified that she said this because it was what workmates had been telling her, she did not know anything about it, and Doe never talked to her about intending to sue the company.

## II.

### *Defense Case at Trial*

#### A. Galvan's testimony

Galvan testified that Ortega was responsible for assigning work but would leave early and leave it to Galvan and Ismael, another foreman, to carry out assignments. When Doe started the job, Ortega assigned her to work with Galvan so Galvan could train her. Galvan testified that there was "a very big connection between the two of us" and within a week "we were already kissing each other." The first time they kissed, they were working on all fours covering carpeting, each had a lollypop, and when they crossed, she put her lollypop in his mouth, he put his in hers, and then they kissed. His relationship with Doe progressed from "just kisses and touching over our clothing" to "private parts." Doe never said she did not want this; she said she liked it and liked being with him. Prior to July 26, Galvan had touched Doe's vagina several times and they had masturbated each other.

Galvan testified that although he was married, he was having affairs with a woman from Modesto and a woman near Santa Rosa. His relationship with his wife was "fractured" and whenever they had fights, he would go to a motel. He testified that Doe "knew everything about me" and they talked about "the deepest secrets that I was never, ever going to tell anyone," but also that their relationship was "just sex" and they had affection for each other, but he did not love her and "she wanted the same thing from me." Asked why he told Doe he loved her, Galvan testified, "Because she also said the same thing to me."

Galvan testified that on July 19, he was using the yellow knife that was now in evidence while he and Doe were working with rolls of carpet. They started to kiss, and she said she wanted to have sex. According to Galvan,

20

Doe got on all fours and suggested he get on top.[13]  They had not had sex before.  Galvan testified that he did not want to have sex with her that day because he had a lot of work to do.  Valencia showed up and stayed to work with Doe, and Galvan went to the first floor to do other things.  The following Monday, Doe told Galvan she had his knife, which he had not realized was missing, and she returned it to him.  According to Galvan, he had had a red knife but lost it before Doe started work.

On July 23 Galvan and Doe went into a room with cabinets and masturbated each other.  He sent her the photo on page 32 of exhibit 3 "as a memory of what happened there."[14]

On July 25, Galvan told Doe he was going to stay overnight in the Bay Area because of an appointment the next day.[15]  When he asked if she wanted to come to the hotel with him, she said " '[n]o' " and " '[w]hat am I going to tell my daughters and mom.  I have to tell them when I'm working overtime.' "  On the morning of July 26, he asked about breakfast because she knew he was in the area.

At work on July 26, Doe dropped her phone without noticing and Galvan put it on top of a box, then as a joke said he did not know where it was when she began to look for it.  During the lunch break, he saw Doe asking other coworkers about her phone and told her " '[m]aybe it's on top of a box back there where we were just working.' "  She said, " 'You have no—' "

---

[13]  Doe testified that she did not do this.

[14]  Doe testified that nothing sexual happened in the room with the cabinets.

[15]  He lived about an hour and a half away from the work site, or up to three or four hours with heavy traffic.

21

and made a gesture as if she was going to hit him. She was "[n]ot necessarily upset or angry."

After the break, Galvan noticed his utility knife was missing. He went to look for it and, as he was asking coworkers about it, Doe texted that she had her knife. Zuniga offered Galvan his knife and Galvan took it.[16] Later, he found an old utility knife in an area where tools and materials were kept and took that as well.

Galvan described closing the doors to hotel rooms much as Doe had, although he denied ever telling Doe to look for caulking inside the rooms. He testified that as they descended the stairs to the ninth floor, they kissed. They began closing doors on the ninth floor hallway and at some point Doe came to him and asked, " 'Hey, neighbor, do you have a cup of sugar?' " He responded, " 'Hey, neighbor, you mean like in the TV program Chespirito?' " She put her arms around his shoulders and neck and kissed him again, and they went into one of the rooms, kissing and undressing as they went.

In the bathroom, she leaned back against the sink. They continued kissing and he "went down her neck," touched and sucked her breasts as she

---

[16] Zuniga testified that he did not remember whether Galvan asked to borrow a knife and that the first time he heard the idea that he had loaned Galvan a knife was at trial. He testified that Galvan had asked whether Zuniga had seen his boxcutter, saying he had forgotten it in the bathroom but could not find it when he went back.

The defense's private investigator testified that when he asked Zuniga whether he remembered loaning Galvan a box cutter on the night of July 26, Zuniga said he did not remember but, " 'I'm pretty sure I didn't because I had mine,' " but also said, " 'Maybe yes. Maybe no. . . . I'm about fifty-fifty.' "

22

took off her top and unbuttoned her pants, and orally copulated her.[17]  She turned around with her forearms over the sink, waist bent at a 90-degree angle and rear end extended toward him.  He performed oral sex "on the part behind" and noticed a bruise on her left buttocks and upper thigh.  He put his penis in her vagina, she told him to ejaculate inside her because she was " 'taking the pills,' "[18] and he did so.  This was the first time they had sexual intercourse.  Galvan testified that everything was consensual and that Doe never hit her forehead.  He testified that Doe's vest was on the sink and his was on the floor, with Zuniga's knife "inside the vest" and the knife he had found on the tool cart in the outside pocket.  The knife shown on the floor of the bathroom in photographs was Doe's.

Galvan told Doe he was going to leave first to make sure no one was around.  She asked him what room they were in and as he stood in the hall, she closed the door.  He finished closing doors on the hallway, then went back and heard Doe "whining," crying and talking to someone.  He knocked and asked if she was okay, and when she did not answer, he attempted to open the door with his card but the "upper lock was on."  Galvan thought Doe might have gotten a phone call about her daughter or a family member being

---

[17]  Asked if this was the first time he had seen Doe's breasts, Galvan testified that around the second week she was at work, Doe showed him her breasts during a conversation in which she told him she had had surgery in Mexico to remove cysts from one of her breasts, and that she has a scar going down from her right nipple that was "pretty obvious."  Doe denied ever telling Galvan about having surgery on her breast or showing him a surgery scar.  She had never had cysts but had breast enlargement surgery on both breasts and had visible scarring that was "[n]ot very" prominent.

[18]  The nurse who conducted Doe's sexual assault examination testified that they discussed emergency contraception because Doe was not taking preventative birth control.

ill.  He kept knocking and asking if she was okay, then heard her say, " 'His name is Francisco.  He wants to come in.' "  He thought, "[W]hat the fuck . . . .  Obviously, she's accusing me."  Through the door he asked what she was doing and begged her to open the door, in disbelief over what was happening.

Scared and confused, Galvan walked down the stairs to the first floor and saw Zuniga outside.  He remembered he had Zuniga's knife and gave it back to him.  He had no idea at this point that he would be accused of using the knife on Doe.  He asked if Zuniga had seen Doe, thinking that if she was playing a trick on him, she might have come down in the elevator.  Zuniga said no and Galvan went back to the ninth floor, at which point Ortega called, asking if everything was okay and where Doe was.  Galvan said Doe was locked in a room on the ninth floor, crying.

Zuniga came into the hallway and asked where Doe was, and Galvan said she was in the room.  As they knocked on the door, asking Doe to open it, other coworkers gathered.  Galvan pushed with all his strength and opened the locked door.  Doe was in the bathroom, in a "fetal position."  Galvan asked why she was " 'doing all this' " and she said, " 'Shut up.  You raped me.  [Zuniga,] he raped me.  This dumbass raped me.  Get him out of here.' "  Galvan tried to explain to Zuniga that he and Doe had a relationship, had had sex in the room, and she was lying, but everyone was listening to Doe, not him.

Galvan left and, as he did, heard Doe saying he had " 'fondled' " her with a knife and remembered that he had the knife he had found.  Galvan saw that the police were arriving "with their rifles."  He went to where Valencia and others were standing and gave Valencia the knife, telling him that Doe was crazy and was saying he had raped her and "fondled her with a knife."  Galvan then went back to the hallway and told a police officer that

24

Doe was lying and they had a relationship. Everyone else was saying, " 'it's him,' " and the officer arrested him. Someone said, " 'Search him. He has a knife in his vest.' " An officer searched him and said he was clean. Asked if he knew at the time of his arrest that Doe had his knife, Galvan replied, "I didn't know that she had my knife until my brain started to put everything together again. And that's when I felt she had the knife."

Galvan testified that Exhibit 3, the WhatsApp messages between him and Doe found on her phone, was missing three weeks of messages from June 4 to 25, which he said she erased. He testified that they had texted "[a] lot" during that period. Galvan testified that messages from July 2 to 17 were also missing. Although he did not remember exactly when, Galvan was sure there were texts from him asking how Doe felt about what was going on between them and from her saying she was "comfortable" and "okay with it" but had a "guilty conscience" because he had a wife and she had a boyfriend. On his own phone, Galvan erased messages from lovers so his wife would not see them but kept a few work-related ones.

## B. Rene Ortega's testimony

Ortega testified that it was his job to set up crews and assign people to projects, and he sometimes assigned Galvan and Doe to work together. Galvan did not have authority to assign Doe to work with him. Ortega was at the jobsite from 4 a.m. to 6 p.m. until about two weeks before July 26, when his ending time was changed to 4:30 p.m. The foreman Ismael was on site from 2 p.m. to 10:30 p.m. Ortega would not expect Galvan to send photographs of work that needed to be corrected to other workers because it was not his job to supervise others, but Ortega did not know whether Galvan had sent such photographs.

Ortega had never observed female coworkers seeming uncomfortable around Galvan, Doe never reported complaints about him and Ortega never suspected Doe was having problems with Galvan at work. He did not know whether Doe and Galvan communicated outside of work. Galvan never told Ortega about having relationships outside his marriage and Ortega's sister never told him she suspected Galvan of doing so. In Ortega's opinion, Galvan was not "the type of guy who would commit rape."[19]

**C. Galvan's Wife's Testimony**

Galvan's wife suspected something was going on at work around May 30 through July 2019 because Galvan "was different." She learned "[a]fter the fact" that he admitted cheating on her with Doe and three other women. Asked about marital problems, she testified that Galvan was upset because of something hurtful she said that was not in fact true but caused him to think she had cheated on him. She testified that it was not Galvan's character to commit rape, explaining that he had never forced her to do anything she did not want to do and "would never hurt his children" or a woman "that way."

**D. Galvan's cell phone data**

A digital evidence investigator testified that data extracted from Galvan's phone showed 100 calls with Doe in the period from June 14 to July 27. There were approximately 130 text message records between June 26 and July 26, some of which could have been duplicates. The bulk of the messages were between July 23 and July 26. He did not find any deleted messages in the evidence he examined but testified that he was not able to

---

[19] Ortega never saw Galvan use drugs at work or heard rumors that he did so. If he had learned Galvan was doing this, Galvan would have been terminated regardless of their personal relationship.

conduct a full examination for deleted messages with the information that was available to him.

### E. Expert testimony

#### 1. *Doe's Injuries*

Forensic pathologist Katherine Raven, the defense expert on the mechanism and detection of injury, testified that although it is very difficult to accurately age a bruise, changes in color give a "good idea" whether a bruise is fresh or older. Based on the photographs of Doe's bruises, and assuming they were taken within six hours of the alleged rape, Raven testified that most of the bruises were older or too small to draw conclusions from, while two small ones near the buttocks and one on the upper right arm appeared "a little more fresh." The forehead injury was very small and the photo showed swelling but no hematoma. This appeared to be a focal injury, from hitting something about a half centimeter in size rather than hitting a broad surface. It could have been caused by hitting a corner of the empty mirror frame. It also could have been caused by Doe hitting herself with the blunt handle of a utility knife. The "defect" in Doe's mouth looked more like a chronic ulcer than an impact injury. The small bruise on Doe's abdomen could have been caused by coming into contact with a small piece of debris such as construction material.

#### 2. *Doe's Potential Civil Claims*

Attorney Katherine Moore testified as an expert witness in civil law related to premises liability and third-party claims. Moore testified that based on the facts Doe described, Doe would have potential causes of action against Galvan for assault, battery, intentional infliction of emotional distress and negligent infliction of emotional distress. She would potentially have the same causes of action against Webcor based on an argument that

27

Webcor knew of Galvan's propensities but did not fire him, thereby setting up a potentially dangerous condition for Doe, working a mostly male-dominated evening shift in a hotel with no lighting and no supervisor on duty. The advantage of suing Webcor would be to potentially collect a judgment against the "deep pocket" large corporation. A criminal conviction against Galvan would establish liability in a civil lawsuit against him; it would not establish liability in a suit against Webcor, but it would be persuasive evidence.

## III.

### *Procedural History*

Galvan was charged by information filed on September 17, 2019, with forcible rape (Pen. Code, § 261, subd. (a)(2))[20] (count 1); forcible oral copulation (§ 287, subd. (c)(2)(A)) (count 2); false imprisonment by violence (§ 236) (count 3); and criminal threats (§ 422, subd. (a)) (count 4). An enhancement for use of a deadly weapon in commission of a specified sexual offense (§ 12022.3, subd. (a)) was alleged for counts 1 and 4.

After a jury trial, Galvan was found guilty of the charged offenses and the enhancement allegations were found true. At sentencing on February 5, 2021, the court struck the deadly weapon enhancement with respect to count 4 and sentenced Galvan to a prison term of 18 years, imposing the upper term of eight years on count 1, the upper term of 10 years for the enhancement on that count, and concurrent middle terms of six years on count 2 and two years on count 4. The court stayed sentence on count 3 pursuant to section 654.

Galvan filed a timely notice of appeal.

---

[20] All further statutory references are to the Penal Code unless otherwise indicated.

28

## DISCUSSION

## I.

### *Galvan Has Not Demonstrated Ineffective Assistance of Counsel.*

Galvan argues he received ineffective assistance of counsel in that his attorney failed to impeach Doe's testimony regarding the meaning of certain Spanish words used in the texts they exchanged. The contention focuses on the word "querer," the infinitive form from which "te quiero" is conjugated. Galvan texted Doe, "te quiero" and Doe used the shorthand "TQM" ("te quiero mucho"). Doe testified that TQM means "I love you a lot" but that in Spanish "it is not love you. It is like I appreciate—I hold you in esteem," and that she did not mean it in a romantic sense. She distinguished "te quiero" from "te amo," which she indicated referred to "deeply love," but acknowledged that when Galvan used "quiero" in the texts, he meant "love."

Galvan argues his attorney should have impeached Doe with expert testimony or other evidence that the "correct" meaning and translation of "querer" is "to love or to want in a desiring way." In his view, Doe's testimony that "querer" means "to appreciate" or "to esteem" rather than "to love" was erroneous and self-serving, and counsel's failure to present evidence to counter it left Doe as the sole source of translation of words she used in text messages that served to impeach her claim of unconsented sex. Galvan argues that there was no physical evidence of forcible sex and the prosecution's attempt to corroborate Doe's testimony with evidence of her distress, such as Perez's testimony about Doe's call to her and the recording of Doe's call to 911, was countered by the defense theory that Doe and Perez contrived the incident to enable Doe to sue Webcor. In Galvan's view, the prosecution's case was undermined by Doe's texts with Galvan, which could "unmistakably" be interpreted as flirtatious, and Doe's efforts to portray

29

herself as having no desire or affection for Galvan called her credibility into question. If defense counsel had presented a linguistic expert to testify to the definition and/or colloquial use of "querer," or even dictionary definitions of the term, Galvan argues, the outcome of the case would have been different.

## A. Governing principles

"When challenging a conviction on grounds of ineffective assistance, the defendant must demonstrate counsel's inadequacy. To satisfy this burden, the defendant must first show counsel's performance was deficient, in that it fell below an objective standard of reasonableness under prevailing professional norms. Second, the defendant must show resulting prejudice, i.e., a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different." (*People v. Mai* (2013) 57 Cal.4th 986, 1009.) " ' "A reasonable probability is a probability sufficient to undermine confidence in the outcome." [Citations].' [Citation]." (*People v. Hart* (1999) 20 Cal.4th 546, 624.)

"When examining an ineffective assistance claim, a reviewing court defers to counsel's reasonable tactical decisions, and there is a presumption counsel acted within the wide range of reasonable professional assistance. It is particularly difficult to prevail on an *appellate* claim of ineffective assistance. On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation." (*People v. Mai, supra,* 57 Cal.4th at p. 1009.)

## B. Analysis

As earlier described, Doe testified that the letters "T-Q-M" she texted to Galvan mean "I love you a lot," but that in Spanish "it is not love you. It is

30

like I appreciate—I hold you in esteem." She testified that "quiero" has "different contexts" and "a lot of conjectures," and contrasted it with "te amo," saying "[i]n order to say 'I love you,' it is te amo, t-e-a-m-o, not te quiero," and it could be the same as in a friendship as it is with a couple. Doe testified that when she used "quiero" in messages to Galvan, she did not mean it in a romantic way, as was the case when she used it in a text to Perez. She recognized that when Galvan told her "te quiero," he meant he loved her, not he appreciated her—as reflected in the fact that when he asked if she loved him, she said "no."

Doe acknowledged there were other words she could have used to show appreciate but chose to use "love," and testified that she "should have put down I hold you in esteem." She testified that she now understood it appeared unprofessional to tell a co-worker, "I love you," but at the time she did not understand this. She acknowledged that Galvan's wife would be "pretty upset" if she saw the message from Doe telling Galvan, "I love you," but testified that if his wife "read the messages where I was telling him to forget about what his wife had said to him, she would understand that it was not an amorous conversation."

Galvan offers excerpts from Spanish-English dictionaries to demonstrate the correct meaning of "querer."[21] The New Cuyas Dictionary translates "querer" as "to will; to desire, wish; to endeavor, attempt; to accept (a challenge in certain games); to love." (New Cuyas Dict. (1966) p. 452.) The same dictionary translates "amar" as "to love." (*Id.* at p. 32.) The Collins Spanish-English Dictionary translates "querer" with indications of its

_____

[21] We granted Galvan's unopposed request for judicial notice of the dictionary definitions and on-line translations he submitted.

31

different senses, including: "1 (*a una persona*) (= *amar*) to love; (= *apreciar* to like" and "2 (= *desear*) . . . to want." (Collins Spanish English Dict. (4th ed. 2002) p. 473 (Collins).) Other meanings and usages described or illustrated in Collins include "I didn't mean to hurt you" and "I'd like two kilos of potatoes, please."[22] (*Ibid.*)

It is apparent from these definitions that there is no singular translation of "querer." Galvan agrees the term "has a plethora of uses and connotations" and is "highly contextual," yet his argument appears to be built on the premise that there is a sharp distinction between the "correct" translation of "querer"—which he states is "to love" or "to want in a desiring way"—and Doe's incorrect testimony that it can mean "to appreciate" or "to esteem." Galvan asserts that while "querer" "can be used to denote general liking or likeability when used with reference to a third person or thing, when spoken directly at someone it signifies want, need, and desire for; that is, 'love' in its appetitive and/or needful aspects."[23]

---

[22] These entries read, "3 (= tener intención de) (+ INFIN) **no quería hacerte daño** I didn't mean to hurt you" and "4 (*pidiendo algo*) **quería dos kilos de patatas, por favor** I'd like two kilos of potatoes, please." (Collins, *supra,* at p. 473.)

[23] The People offer excerpts from two websites to show that Doe's distinction between colloquial uses of "te quiero" and "te amo" was accurate. While we draw no conclusion about the accuracy of Doe's testimony, we observe that the fundamental point in both excerpts is that "te amo" is seen as more serious, romantic and intimate while "te quiero" is more casual. (Te Amo vs. Te Quiero: Differences in "I Love You" in Spanish <https://www.englishtospanishraleigh.com/blog/te-amo-vs-te-quiero-differences-in-i-love-you-in-spanish> [as of April 24, 2023]; Te Quiero vs. Te Amo <https://naatikmexico.org/blog/te-quiero-vs-te-amo> [as of April 24, 2023].)

To the extent Galvan is arguing that "te quiero," as used in texts between him and Doe, *necessarily* connotes "want, need, and desire for," the sources of translation he relies on do not support the argument. Collins, for example, indicates "querer" can mean "to love" in the sense of the Spanish "amar" but also "to like," and gives examples including both a romantic sense ("I'm madly in love with her") and a non-romantic one ("he is well liked at the office"). The examples Collins provides for the meaning "to want" (referring to the Spanish "desear") do not suggest "want" in a sexual sense but rather

Galvan sees the first of these websites as confirming his description of "querer" as "signif[ying] appetitive desire" while "amar" "reflects affection." We do not agree. The site explains that querer is "[l]iterally translated to, 'I want you,'" but says it is "most appropriate for expressing love to family, close friends or significant others." (Te Amo vs. Te Quiero: Differences in "I Love You" in Spanish <https://www.englishtospanishraleigh.com/blog/te-amo-vs-te-quiero-differences-in-i-love-you-in-spanish> [as of April 24, 2023].) As two of the three examples of appropriate use involve platonic forms of love, the literal translation does not appear to carry the same meaning as "I want you" does in English. The People's other source makes this point, stating, "te quiero" "literally means 'I want you' but its most common meaning is 'I love you' and is considered an appropriate way to express platonic love." (Te Quiero vs. Te Amo <https://naatikmexico.org/blog/te-quiero-vs-te-amo> [as of April 24, 2023].) Other websites directly state that "te quiero" generally does not mean "I want you" in the physical sense. (Te Quiero vs Te Amo: What's the Difference? <https://discoverdiscomfort.com/te-quiero-vs-te-amo/> [as of April 24, 2023] ["*querer* also means 'to want', but not in the sense of desire, as in 'I want you.' . . . [I]t means 'I care about you' or 'I love you'"]; Te Quiero vs Te Amo: Don't Say the Wrong 'I Love You' in Spanish <https://www.spanish.academy/blog/te-quiero-vs-te-amo-dont-say-the-wrong-i-love-you-in-spanish/> [as of April 24, 2023] ["*Querer* is rarely used to say 'I want you' in a romantic sense"]; 'Te Quiero' vs 'Te Amo' in Spanish/Differences and Examples <https://www.tellmeinspanish.com/vocab/te-quiero-vs-te-amo/> [as of April 24, 2023] [" 'te quiero' is rarely used as a synonym of '*I want you*' . . . because 'querer' expresses feelings and affection, while 'I want you' may be understood as a physical desire"].)

include "which one do you want?" "she does what she wants," "he wants to be an engineer" and "I don't want you to go."

Galvan takes issue with Doe's testimony that "querer" means appreciation or esteem. At least as to appreciation, however, Galvan's own authorities suggest Doe was not wrong: One of the meanings Collins lists for "querer" is "(= *apreciar*) to like." (Collins, *supra,* at p. 473.) Apreciar is the infinitive form of "aprecio," which Galvan says is the Spanish word meaning appreciation. Collins defines "apreciar" as "to be fond of/like," "to value," "to appreciate." (Collins, <https://www.collinsdictionary.com/us/dictionary/spanish-english/apreciar> [as of April 24, 2023].)[24]

In any event, Doe's testimony about the meaning of "te quiero" did not call for rebuttal by expert testimony. It is clear from Doe's testimony as a whole that she was attempting to address the multiple meanings and connotations of "te quiero," to distinguish "I love you" in a deeper sense from a more casual one, and to dissociate *her* use of the term "quiero" from any romantic connotation it could carry. She testified that "te quiero" has "different contexts" and "a lot of conjectures," and that she did not mean it in a romantic sense in her texts with Galvan, just as when she used it in texts with Perez. But she acknowledged that the phrase *could* mean "I love you" in a romantic sense and that Galvan used it this way in his texts to her: She understood that when he told her, "te quiero," he meant he "love versus appreciation." Doe made it clear she was explaining her subjective meaning

---

[24] Doe acknowledged she could have used words other than "quiero" to express appreciation for Galvan and testified that she should have said, "I hold you in esteem" instead.

and intention when, in response to defense counsel asking if she was saying that "when [Galvan] tells you 'I love you,' using the word 'quiero,' that means love, but when you say it back to him, that does not mean love," Doe responded, "I know that when I say it what it means."[25]  The jury could not have understood Doe as testifying that "te quiero" *never* means "I love you" and *only* means appreciation or esteem, or as purporting to provide a definitive definition as opposed to explaining the meaning she intended. What Doe subjectively meant by saying "te quiero" to Galvan is not a point expert testimony could have addressed.

Nor is it apparent that an expert witness would have bolstered Galvan's case.  The various meanings of "querer" and nuances of its use appear to leave significant room for subjective differences in understanding and usage, and raise considerable doubt that there is a definitive, objective definition an expert could have provided.  And Doe acknowledged the range of potential meanings.

Moreover, even if Doe's testimony that she meant to be expressing appreciation and esteem for Galvan was based on an erroneous translation of "te quiero," we fail to see how expert testimony that "querer" can mean romantic love and *cannot* mean appreciation or esteem could have altered the jury's assessment of Doe's credibility or outcome of the case.  As we have said, Doe acknowledged that the term can mean romantic love.  If it cannot mean

---

[25]  Defense counsel followed up by asking, "So I see what you are telling us then is even though you said, 'I love you,' you didn't actually mean it," and Doe replied, "Correct."  Asked how she expected Galvan to know this, Doe referred to the texts she had sent Galvan in their discussion about the problems between him and his wife and said, "If I were to want to have a relationship with him myself, I wouldn't have tried to mediate for him to have a better relationship with his wife."

appreciation or esteem, evidence to that effect might have suggested a reason for the jury to question Doe's credibility. But defense counsel repeatedly challenged her credibility both with respect to the texts and in general. Defense counsel thoroughly cross examined Doe about the meaning of her texts, emphasizing messages that suggested she was flirting with Galvan or seemed to imply they had a romantic or sexual relationship or Doe was holding open the possibility of one. Defense counsel questioned why Doe continued or initiated conversations with Galvan if he was bothering her. Counsel questioned Doe's credibility generally, for example by pointing to inconsistencies in her various statements to the police, and attacked it directly by advancing the theory that she falsely accused Galvan of rape in order to create a claim for which she could sue Webcor.

The jury could not have failed to recognize the affection and familiarity reflected in the text messages. Indeed, the prosecutor spent considerable time proactively having Doe explain in a neutral manner texts she sent that appeared "flirty" or failed to shut down Galvan's provocative ones—which, of course, served to highlight their romantic or sexual connotations and Doe's efforts to minimize those connotations.[26] In short, the jury had ample basis

---

[26]  For example, in response to texts from Galvan saying she was the "best thing that has happened to me," and "in my chest, there is something that wants to come out every time I'm near you," Doe said she felt the same as him. She testified at trial that this was a mistake and explained how she meant to be responding to a prior message by saying she felt the same regarding "the admiration that I had told him that I had for him in the past." When Galvan said he thought he and Doe had something in common that "makes us attractive to each other" and "makes us feel this," Doe responded, " 'Well, what do you think it is,' " but testified that she said this "jokingly." She testified that her comment to Galvan, in their conversation about problems in his marriage, that "having a handsome husband is not easy" was

for doubting Doe's credibility, but believed her at least with respect to the assault she described. There is no reasonable probability expert testimony on the meaning of "querer" would have altered its assessment.

## II.
### *The Trial Court Did Not Err in Instructing the Jury with CALCRIM No. 1190.*

Galvan next contends the trial court erred in instructing the jury with CALCRIM No. 1190 in addition to CALCRIM No. 301. CALCRIM No. 301 instructs, "[t]he testimony of only one witness can prove any fact. Before you conclude that the testimony of one witness proves a fact, you should carefully review all the evidence." CALCRIM No. 1190 states, "Conviction of a sexual assault crime may be based on the testimony of a complaining witness alone." Galvan argues that giving these instructions together unfairly emphasized Doe's testimony and lightened the prosecution's burden of proof by commenting on the weight to give her testimony.[27]

This argument has been rejected by the California Supreme Court with respect to earlier versions of the instructions Galvan challenges, CALJIC No. 2.27 (the predecessor to CALCRIM No. 301) and CALJIC No. 10.60 (the predecessor to CALCRIM No. 1190). (*People v. Gammage* (1992) 2 Cal.4th 693 (*Gammage*).) At the time *Gammage* was decided, CALJIC No. 2.27 stated, " 'Testimony as to any particular fact which you believe given by one witness is sufficient for the proof of that fact. However, before finding any

---

simply referring to " 'when a woman is jealous, it becomes more complicated.' "

[27] The People acknowledge that Galvan's failure to object to the instructions in the trial court does not preclude him from raising it here. (*People v. Taylor* (2010) 48 Cal.4th 574, 630, fn. 13; § 1259 [appellate court may review instruction despite absence of objection below "if the substantial rights of the defendant were affected thereby"].)

fact required to be established by the prosecution to be proved solely by the testimony of such a single witness, you should carefully review all the testimony upon which the proof of such fact depends.' " (*Gammage,* at p. 696, quoting former CALJIC No. 2.27 (4th ed. 1986 rev.), italics omitted.) CALJIC No. 10.60, at that time, provided, " 'It is not essential to a conviction of a charge of rape that the testimony of the witness with whom sexual intercourse is alleged to have been committed be corroborated by other evidence.' " (*Gammage,* at pp. 696-697, quoting former CALJIC No. 10.21 (4th ed. 1970 rev.), which became CALJIC No. 10.60 (5th ed.).)

As *Gammage* explained, California law used to require that juries in sexual assault cases be instructed to view the complaining witness's testimony with caution, explaining that such charges are " ' "easily made and, once made, difficult to defend against, even if the person accused is innocent." ' " (*Gammage, supra,* 2 Cal.4th at p. 695, quoting *People v. Rincon-Pineda* (1975) 14 Cal.3d 864, 871.) *Rincon-Pineda* held this instruction had " 'outworn its usefulness' " and " 'perform[ed] no just function' " (*Gammage,* at p. 695, quoting *Rincon-Pineda,* at pp. 877, 883), in part because the low rate of successful prosecutions for such offenses showed defendants were not "subject to capricious conviction." (*Rincon-Pineda,* at pp. 879-882.) *Rincon-Pineda* held the cautionary instruction should no longer be given and instead mandated a jury instruction that is equivalent to CALJIC No. 2.27 and CALCRIM No. 301. (*Rincon-Pineda,* at p. 885.)

*Gammage* rejected the argument that instructing the jury with both CALJIC No. 2.27 and CALJIC No. 10.60 "unconstitutionally 'creates a preferential credibility standard for the complaining witness.' " (*Gammage, supra,* 2 Cal.4th at p. 700.) The court explained: "Although the two instructions overlap to some extent, each has a different focus. CALJIC

38

No 2.27 focuses on how the jury should evaluate a fact (or at least a fact required to be established by the prosecution) proved solely by the testimony of a single witness. It is given with other instructions advising the jury how to engage in the *fact-finding* process. CALJIC No. 10.60, on the other hand, declares a substantive rule of law, that the testimony of the complaining witness need not be corroborated. It is given with other instructions on the legal elements of the charged crimes.

"Because of this difference in focus of the instructions, we disagree with defendant . . . that, in combination, the instructions create a preferential credibility standard for the complaining witness, or somehow suggest that that witness is entitled to a special deference. The one instruction merely suggests careful review when a fact depends on the testimony of one witness. The other tells the jury there is no legal corroboration requirement. Neither eviscerates or modifies the other. . . . 'There was no singling out of the testimony of the prosecuting witness with a view of giving it undue prominence before the jury.' [Citation]. Nor do the instructions 'dilute[] the "beyond a reasonable doubt" standard.' [Citation]. The instructions in combination are no less correct, and no less fair to both sides, than either is individually." (*Gammage, supra,* 2 Cal.4th at pp. 700-701.)

Galvan argues that *Gammage*'s reasoning does not apply to CALCRIM No. 1190 because of a "critical difference in . . . phrasing." CALJIC No. 10.60 informed the jury that the complaining witness's testimony did not need to be "corroborated by other evidence," which is the language *Gammage* relied on in concluding CALJIC No. 10.60 focused on the legal elements of the crime rather than the fact-finding process that was the focus of CALJIC No. 2.27. Because CALCRIM No. 1190 "says nothing about corroboration," according to Galvan, it "has nothing to do with 'the legal elements of the charged crimes.' "

39

We disagree. There is no substantive difference between the instruction that a complaining witness's testimony need not be "corroborated by other evidence" (CALJIC No. 10.60) and the instruction that a conviction in a sexual assault case "may be based on the testimony of a complaining witness alone." (CALCRIM No. 1190.)[28] Both convey the legal principle that evidence beyond the complaining witness's testimony is not required. Like CALJIC No. 10.60, CALCRIM No. 1190 is given "with other instructions on the legal elements of the charged crimes," while CALCRIM No. 301, like CALJIC No. 2.27, is given with other instructions on "how to engage in the *fact-finding* process." (*Gammage, supra,* 2 Cal.4th at pp. 701, 700.)[29]

[28] Galvan argues in his reply brief that there is a "further distinction which was not raised in *Gammage* at all" in that CALJIC No. 10.60 and CALCRIM No. 1190 use the word "conviction," and that the People's failure to answer this argument should be taken as a concession of its merit. Galvan does not further explain his point; he simply cites to pages of his opening brief. Those pages address the significance of the fact that the word "corroboration" does not appear in CALCRIM No. 1190, an argument the People's brief *does* address (albeit unsatisfactorily, in Galvan's view). We fail to see what point Galvan believes the People have conceded.

[29] CALCRIM No. 301 was given immediately after an instruction that neither party is required to call all witnesses who might have information or present all evidence that might be relevant (CALCRIM No. 300) and was followed by instructions not to resolve a conflict in the evidence by counting the number of witnesses who agree or disagree or to disregard a witness's testimony without reason or due to bias (CALCRIM No. 302), instructions on how to evaluate expert witnesses' testimony (CALCRIM No. 332), how to evaluate the opinions of witnesses who did not testify as experts (CALCRIM No. 333), how to evaluate character testimony, including that the defendant was not predisposed to commit rape (CALCRIM No. 350), and how to evaluate evidence of the defendant's out-of-court statements (CALCRIM Nos. 358, 359, 362).

The trial court then instructed on the elements of the two charged sexual offenses, rape and oral copulation, followed by CALCRIM No. 1190.

Galvan's contention that CALCRIM No. 1190 rephrased the general instruction provided by CALCRIM No. 301 and applied it exclusively to the prosecution's main witness, thereby signaling that her testimony "did not need to be scrutinized as closely as other evidence," is not persuasive.

Galvan urges that the historical underpinnings of *Gammage*'s analysis no longer justify its conclusion. He points to the reasoning of Justice Mosk's concurring opinion in *Gammage,* which argued that because juries were no longer instructed to view a complaining witness's testimony with caution, there was no longer a need to instruct that corroboration of a complaining witness's testimony is not necessary. (*Gammage, supra,* 2 Cal.4th at p. 703, conc. opinion of Mosk, J.) Noting that prosecutions for sexual offenses were no longer less successful than those for other major crimes (which had been the justification for requiring the cautionary instruction), Justice Mosk questioned the assumption that jurors still harbored the misconception that the testimony of the victim in a sexual offense case had to be corroborated and warned that the no-corroboration instruction could be harmful because it could be understood to favor the complaining witness's testimony and disfavor that of defense witnesses. (*Id.* at pp. 703-705.) Galvan argues that more recent statistics show "prosecutors no longer continue to face special difficulty obtaining convictions" in sexual offense cases, making it

---

The next instructions informed the jury that if it concluded the prosecution had proven one of the sexual offenses beyond a reasonable doubt, it was permitted, but not required, to conclude he was disposed to and did commit the other (CALCRIM No. 1191B), and that it was permitted to consider evidence that Doe engaged in consensual sexual acts with Galvan prior to the charged offenses solely to help decide whether she consented to the charged acts (CALCRIM No. 1194).

The instructions then moved on to the elements of the non-sexual offenses.

41

unnecessary to provide an instruction as a counterweight to the long since discredited corroboration rule.

*Gammage* recognized that at the time it was decided in 1975 " 'the historical imbalance between victim and accused in sexual assault prosecutions' ha[d] been partially redressed" (*Gammage, supra,* 2 Cal.4th at p. 701, quoting *Mary M. v. City of Los Angeles* (1991) 54 Cal.3d 202, 222, conc. opn. of Arabian, J.)) but nevertheless held "there remains a continuing vitality in instructing juries that there is no legal requirement of corroboration. Further, even if we were to assume, which we do not, that all juries are aware of the no-corroboration requirement, or would glean it from CALJIC No. 2.27 [now CALCRIM No. 301] itself, no harm is done in reminding juries of the rule. [¶] The jury is instructed that the prosecution must prove its case beyond a reasonable doubt. This places a heavy burden of persuasion on a complaining witness whose testimony is uncorroborated. CALJIC No. 10.60 [now CALCRIM No. 1190] does not affect this instruction but, . . . when all the instructions are given, 'a balance is struck which protects the rights of both the defendant and the complaining witness.' " (*Gammage,* at p. 701, quoting *People v. Hollis* (1991) 235 Cal.App.3d 1521, 1526.) We are bound to follow *Gammage.* (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

Galvan also points to cases from other jurisdictions that have reached the opposite conclusion to *Gammage.* (E.g., *Gutierrez v. State* (Fla. 2015) 177 So.3d 226, 229-230, 231-232 [no-corroboration instruction is improper comment on testimony, presents "impermissible risk that the jury will conclude it need not subject the victim's testimony to the same tests for credibility and weight applicable to other witnesses" and lends "an extra element of weight to the victim's testimony"]; *State v. Stukes* (S.C. 2016)

787 S.E.2d 480, 499 ["By addressing the veracity of a victim's testimony in its instructions, the trial court emphasizes the weight of that evidence in the eyes of the jury" and "invites the jury to believe the victim"].)

Other jurisdictions have reached conclusions consistent with *Gammage.* (E.g., *Gaxiola v. State* (Nev. 2005) 119 P.3d 1225, 1232 ["A 'no corroboration' instruction does not tell the jury to give a victim's testimony greater weight, it simply informs the jury that corroboration is not required by law"]; *Pitts v. State* (Miss. 2020) 291 So.3d 751, 758-759 [no-corroboration instruction correct statement of law and not improper comment on weight of evidence].)

This split in authority (see *State v. Kraai* (Iowa 2022) 969 N.W.2d 487, 493-495 [collecting conflicting cases]), however interesting, does not affect our duty to adhere to *Gammage.*[30]

Galvan's equal protection argument is also unavailing. Galvan argues that his constitutional right to equal protection was violated by instructing the jury that conviction could be based on Doe's testimony alone without also instructing that acquittal could be based on Galvan's testimony alone. He maintains that he was subjected to disparate treatment because he and Doe

---

[30] Taking umbrage at the People's comment that he "tellingly" started his argument with citation to out-of-state authority, Galvan states that he referred to out-of-state cases "in the absence of any published case squarely on point on the facts." *Gammage,* of course, is on point. The distinction Galvan relies on to argue *Gammage* is not controlling is that CALJIC No. 10.60 explicitly referred to "corroboration" and CALCRIM No. 1190 does not. But the out-of-state cases Galvan relies on addressed instructions expressly using the term "corroboration," just like *Gammage.* Galvan's discussion of these cases thus appears to be no more than an attempt to convince us that *Gammage* was wrongly decided.

43

were both witnesses at trial but CALJIC No. 1190 in effect told the jury that Doe's testimony was to be given extra weight.

Although *Gammage* did not expressly refer to equal protection, it implicitly rejected an equal protection challenge like Galvan's in disagreeing with the contention that CALJIC No. 10.60, combined with CALJIC No. 2.27, "unconstitutionally 'creates a preferential credibility standard for the complaining witness.' " (*Gammage, supra,* 2 Cal.4th at p. 700.) The Supreme Court's conclusion necessarily eliminates the foundation of Galvan's equal protection claim—that the instructions directed the jury to give extra credence to Doe's testimony over Galvan's. Galvan again attempts to distinguish *Gammage* by arguing that the absence of the word "corroborated" in CALCRIM No. 1190 renders inapplicable the distinction that *Gammage* relied on in finding that CALJIC No. 10.60 focused on a legal standard rather than just reiterating the fact-finding guidance provided by CALJIC No. 2.27, and therefore did not give preferential weight to a complaining witness's testimony. As we have said, we see CALCRIM No. 1190 as substantively equivalent to CALJIC No. 10.60 notwithstanding the change in wording. *Gammage* is controlling.

## III.

### *A Remand for Resentencing Is Necessary*

#### A. Senate Bill No. 567

As earlier noted, Galvan was sentenced to the upper term of eight years on count 1 and the upper term of 10 years on the enhancement for use of a deadly weapon in commission of that offense. At the time of sentencing, section 1170, subdivision (b), gave the trial courts broad discretion to decide which of the three terms specified for an offense would best serve the interests of justice. (See § 1170, subd. (b), as amended by Stats. 2020, ch. 29,

44

§ 14.) Subsequently, Senate Bill No. 567 (2021-2022 Reg. Sess.) amended section 1170, subdivision (b) in a number of respects, one of which was to make the middle term of imprisonment the presumptive sentence. (§ 1170, subd. (b)(2); Stats. 2021, ch. 731, § 1.3.) Under the amended statute, "[w]hen a judgment of imprisonment is to be imposed and the statute specifies three possible terms, the court shall, in its sound discretion, order imposition of a sentence not to exceed the middle term, except as otherwise provided in paragraph (2)." (§ 1170, subd. (b)(1).) "A trial court may impose an upper term sentence only where there are aggravating circumstances in the crime and the defendant has either stipulated to the facts underlying those circumstances or they have been found true beyond a reasonable doubt. (§ 1170, subd. (b)(1)–(2).)" (*People v. Flores* (2022) 75 Cal.App.5th 495, 500.) The sentencing court can also rely on certified records of conviction without having to submit the prior convictions to the jury. (*Ibid.*; § 1170, subd. (b)(3).)

The parties agree that the Senate Bill No. 567 (2021-2022 Reg. Sess.) amendments apply retroactively to this case as an ameliorative change in the law applicable to all nonfinal convictions on appeal. (*People v. Superior Court* (*Lara*) (2018) 4 Cal.5th 299, 308; *People v. Flores* (2021) 73 Cal.App.5th 1032, 1039.) They further agree that Galvan did not stipulate to any of the aggravating factors the trial court cited in imposing the upper term sentences and that none of these factors were found true beyond a reasonable doubt by the jury. We concur.

**B. Remand for Resentencing Is Required.**

The parties disagree as to the need for resentencing. The People maintain remand is unnecessary because any error was harmless beyond a reasonable doubt. Galvan contends the error that occurred here can never be found harmless. Neither of these positions is correct.

45

The People rely on the principle that " '[i]f a reviewing court concludes, beyond a reasonable doubt, that the jury, applying the beyond-a-reasonable-doubt standard, unquestionably would have found true at least a single aggravating circumstance had it been submitted to the jury,' the error [in failing to submit the circumstance to the jury] is harmless." (*People v. Flores, supra,* 75 Cal.App.5th at p. 500, quoting *People v. Sandoval* (2007) 41 Cal.4th 825, 839 (*Sandoval*).)

This test, by which *Sandoval* applied harmless error review under *Chapman v. California* (1967) 386 U.S. 18 to denial of the right to a jury trial on aggravating circumstances that expose a defendant to an elevated sentence, does not fully address the issue under the amended section 1170, subdivision (b). The Senate Bill No. 567 (2021–2022 Reg. Sess.) amendments "chang[ed] the framework within which the trial court exercises its discretion by specifying a legislatively determined presumptive sentence. This means we must ask both whether we can be certain the jury would have found beyond a reasonable doubt the aggravating circumstances relied on by the court *and* whether the trial court would have exercised its discretion in the same way if it had been aware of the statutory presumption in favor of the middle term. (*People v. Lopez* (2022) 78 Cal.App.5th 459, 463, 466-467, fns. 10 & 11 [*Lopez*].)" (*People v. Wandrey* (2022) 80 Cal.App.5th 962, 982, review granted Sept. 28, 2022, S275942.)

" ' "[D]efendants are entitled to sentencing decisions made in the exercise of the 'informed discretion' of the sentencing court. [Citations.] A court which is unaware of the scope of its discretionary powers can no more exercise that 'informed discretion' than one whose sentence is or may have been based on misinformation regarding a material aspect of a defendant's record." [Citation.]' (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391;

see *People v. Marquez* (1983) 143 Cal.App.3d 797, 803 ['an erroneous understanding by the trial court of its discretionary power is not a true exercise of discretion'].) Therefore, where a trial court cannot have acted with ' " 'informed discretion,' " ' 'the appropriate remedy is to remand for resentencing unless the record "clearly indicate[s]" that the trial court would have reached the same conclusion "even if it had been aware that it had such discretion." [Citations.]' (*Gutierrez*, at p. 1391.)" (*Lopez, supra,* 78 Cal.App.5th at p. 467; *People v. Ross* (2022) 86 Cal.App.5th 1346, 1353, review granted March 15, 2023. S278266 (*Ross*).)

Under the amended 1170, subdivision (b), we can find harmless error if we can " 'conclude beyond reasonable doubt that a jury would have found true beyond a reasonable doubt *all* of the aggravating factors on which the trial court relied in exercising its discretion to select the upper term.' " (*People v. Ross, supra,* 86 Cal.App.5th at p. 1354, italics added, quoting *Lopez, supra,* 78 Cal.App.5th at p. 467, fn. 11.) In that situation, " 'the defendant has not suffered prejudice from the court's reliance on factors not found true by a jury in selecting the upper term.' " (*Ross,* at p. 1354.) If we can only conclude that the jury would have found true beyond a reasonable doubt one, or some, of the factors the trial court relied upon, we can find the error harmless only if we can find it reasonably probable (*People v. Watson* (1956) 46 Cal.2d 818, 836) that the trial court " 'would nevertheless have exercised its discretion to select the upper term if it had recognized that it could permissibly rely on only a single one of the aggravating factors, a few of the aggravating factors, or none of the aggravating factors, rather than all of the factors on which it previously relied.' " (*Ross,* at pp. 1354-1355, quoting *Lopez,* at p 467, fn. 11.)

Here, we cannot confidently say the jury would have found *any* of the aggravating factors true beyond a reasonable doubt. The trial court relied on

four factors. First, the court found that Doe was particularly vulnerable (Cal. Rules of Court, rule 4.421(a)(3))[31] in that she was "one of only two women that were working in a predominantly male construction site," she was "isolated on an elevated floor" of a hotel that was under construction, without active power, "alone in the dark with [Galvan] in a place where her co-workers were far away and could not hear her," and Galvan was aware of this and, according to Doe, pointed it out to her, threatening her with a knife and telling her "not to scream because there was no one to hear her." Second, the court found that the circumstances of the offense demonstrated planning, sophistication and professionalism (rule 4.421(a)(8)) in that Galvan "chose a location wherein he isolated the victim from potential help" after having "spent a great deal of time on a job site building a relationship of trust with her." Third, the court found Galvan was "in a position of trust and confidence vis-a-vis [Doe] at the time of the offense" (rule 4.421(a)(11)), having spent "a great deal of time prior to the offense[] engaged in building a social relationship with her designed to engender trust and affection from her with the exchange of various text messages and telephone calls[,] often under circumstances where she was attempting to rebut him." Finally, the court found the offense involved violent conduct indicating a "serious danger to society" (rule 4.421, subd. (b)(1)), which in the court's view was exacerbated by "the utter lack of remorse that [Galvan] has displayed throughout this process." The court commented that at sentencing and at times during his testimony at trial, when discussing something Doe had said or how she said it, Galvan would "raise his voice and change the pitch to emulate her in that

---

[31] Further references to rules will be to the California Rules of Court.

mocking way," and that he said things that were "disparaging" of her in his statement to the court.[32]

*Sandoval* cautioned that, "to the extent a potential aggravating circumstance at issue in a particular case rests on a somewhat vague or subjective standard, it may be difficult for a reviewing court to conclude with confidence that, had the issue been submitted to the jury, the jury would have assessed the facts in the same manner as did the trial court." (*Sandoval*, *supra,* 41 Cal.4th at p. 840.) All the aggravating factors the court relied on here are of this nature, requiring "an imprecise quantitative or comparative evaluation of the facts." (*Ibid*.)[33]

---

[32] The court noted that although there was evidence that the offenses involved "great violence and threat of great bodily harm" (rule 4.421(a)(1)) and use of a weapon (rule 4.421(a)(2)), it would not rely on these as aggravating circumstances because use of force was an element of the offense and use of a deadly weapon was an element of the enhancement. The court found a single mitigating circumstance, that Galvan had no prior criminal record.

[33] Contrary to the People's characterization, this case is not just like *People v. Wilson* (2008) 44 Cal.4th 758. The People rely on *Wilson* to argue the jury had a stark choice—to believe Doe or to believe Galvan—and having chosen to believe Doe, necessarily would have found the aggravating circumstances true. As a factual matter, the *Wilson* court referred to a "stark choice" on a very different record. There, victim described facts indisputably demonstrating her vulnerability: She testified that the defendant raped her after driving her to an isolated place with her six-month-old baby in the car, while her other children and boyfriend were being held at gunpoint at the defendant's house and her boyfriend's brother, whom the defendant had already shot, was being tortured by the defendant's confederates. (*Id*. at p. 813.) The defendant's only evidence was his pretrial statement to the police denying the rape; there was no other evidence suggesting the victim testified untruthfully, and her credibility was supported by evidence that the defendant had sexually assaulted his previous fiancée more than once. (*Ibid*.) Here, Galvan presented considerable evidence and argument challenging Doe's credibility. While the jury ultimately accepted Doe's version of the

49

Remand for resentencing is required.[34]  On remand, the People may elect to proceed under the amended section 1170, subdivision (b), by proving the existence of aggravating factors beyond a reasonable doubt to a jury (or to the court, if Galvan waives his right to a jury trial), or the People may accept resentencing on the record as it stands.  (*Lopez, supra,* 78 Cal.App.5th at p. 468.)[35]

_____

forcible sexual assault, it could have done so without believing every aspect of her testimony, including some of the facts underlying the aggravating factors. Moreover, since *Wilson* applied the *Sandoval* test for harmless error, for the reasons we have explained, it does not fully resolve the issues under the amended section 1170.

[34]  This conclusion makes it unnecessary for us to address Galvan's contention that remand is *always* required for this kind of error.

[35]  Galvan appears to suggest there is no authority for allowing the People the option of electing to prove the aggravating circumstances to a jury. He asserts that if the People are seeking a "non-bifurcated 'trial by the jury' on aggravating factors, then the only way to avoid violation of the Double Jeopardy Clause would be for the *entire* judgment" to be reversed, because Galvan "knows of no authority for retrial of a part of the charge."  Galvan cites *Sealfon v. U.S.* (1948) 332 U.S. 575 for the proposition that a "prior verdict of acquittal 'operates to conclude those matters in issue which have been determined by a previous verdict, even though the offenses be different.' "  *Sealfon* held that a defendant who had been acquitted of conspiracy to commit an offense could not thereafter be convicted of the substantive offense under principles of res judicata; a double jeopardy claim had been abandoned.  (*Id.* at pp. 578-580.) After examining the records of the two trials, the Court concluded that the issues necessary to conviction in the second trial had been determined in favor of the defendant in the first:  The trial on the substantive offense "was a second attempt to prove the agreement which at each trial was crucial to the prosecution's case and which was necessarily adjudicated in the former trial to be non-existent."  (*Id.* at p. 580.)

We fail to see how *Sealfon* bears on the question in the present case. Galvan has not been acquitted of anything; his claim of error with respect to the aggravating circumstances is that the issues have never been submitted to a jury.

## DISPOSITION

The convictions are affirmed, the sentence is vacated and the matter remanded. With respect to count 1 and the accompanying enhancement, the People may elect to proceed under the amended section 1170, subdivision (b), by proving the existence of aggravating factors beyond a reasonable doubt to a jury (or to the court if Galvan waives his right to a jury trial) or may accept resentencing on the record as it stands. After the People make this election and the court conducts any necessary further proceedings, the court is directed to resentence Galvan in accordance with currently applicable sentencing laws.

_____

STEWART, P.J.

We concur.

_____

RICHMAN, J.

_____

MARKMAN, J. *

*People v. Galvan Martinez* (A161995)

* Judge of the Alameda Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.